FILED by TB D.C.

Dec 23, 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. –MIAMI

U.S. DISTRICT COURT
FILED
DEC 09 2015
S.D. OF N.Y.

# 15-21004-CR-ALTONAGA/O'SULLIVAN

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | 13 Cr. 963 (KMW) |
|---|---|
| - v - | |
| STEPHEN M. COSTA, | |
| Defendant. | |

**Consent to Transfer of Case for Plea and Sentence (Rule 20)**

I, Stephen M. Costa, defendant, have been informed that an indictment is pending against me in the above designated case. I wish to plead guilty to the offenses charged, to consent to the disposition of the case in the Southern District of Florida in which I am present, and to waive trial in the above captioned District.

Dated: Nov 19, 2015 at M-D

_____
Stephen M. Costa, Esq.

Witness: _____
Jacqueline F. Gonzalez

_____
Lilly Ann Sanchez, Esq.

**Approved**

_____      _____
United States Attorney for the             United States Attorney for the
Southern District of New York              Southern District of Florida

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

STEPHEN M. COSTA,

      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - x

**JUDGE WOOD**

**SEALED INDICTMENT**

13 CR. ___

**13 CRIM 963**

## COUNT ONE

### THE SCHEME TO DEFRAUD

The Grand Jury charges:

1. This scheme involved the unlawful diversion and trafficking of prescription drugs that previously had been dispensed in the New York City area to Medicaid recipients ("second-hand" drugs) in a national, underground market. The prescription drugs involved in this scheme were not drugs of abuse, but rather were drugs designed to treat various illnesses, including, for example, HIV, schizophrenia, and asthma. These second-hand drugs were originally dispensed to Medicaid recipients in the New York City area who then sold the drugs into collection and distribution channels that ultimately ended at pharmacies that re-sold the second-hand drugs to unsuspecting consumers, to be reimbursed by Medicaid or other

A CERTIFIED COPY
RUBY J. KRAJICK, CLERK
BY _____
Deputy Clerk

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: DEC _ _ 2015

unsuspecting insurance companies. Through the methods described herein, the participants profited by exploiting the difference between the cost to the patient of obtaining bottles of prescription drugs through Medicaid - which typically is zero - and the hundreds of dollars per bottle that pharmacies paid to purchase those drugs to distribute to their customers. To reap maximum profits, the participants targeted the most expensive drugs, such as Atripla, Trizivir, and Zyprexa, and Truvada, which have Medicaid values in excess of $1,000 per bottle.

2. To effectuate the fraudulent scheme, the lowest level participants in the scheme (the "Medicaid Beneficiaries") filled prescriptions for month-long supplies of drugs at pharmacies throughout the New York City area, using Medicaid benefits to pay the cost. The Medicaid Beneficiaries were typically AIDS patients or individuals who suffered from other illnesses and who sold their medications for cash rather than use them for treatment. Medicaid Beneficiaries sold their bottles of drugs to other participants in the scheme ("Collectors") at locations like street corners and bodegas in and around New York City, including in the Washington Heights neighborhood of Manhattan and in the Bronx. Collectors sold the second-hand bottles they collected to other participants in the scheme ("Aggregators"), who typically bought large quantities of second-hand drugs from

multiple Collectors.  Aggregators sold the second-hand drugs to other Aggregators higher up the chain, who typically bought large amounts from multiple Aggregators.  Eventually, the second-hand drugs made their way to the highest-level Aggregators involved in the scheme, who sold the second-hand drugs into distribution channels ultimately leading to pharmacies to be dispensed to unsuspecting consumers.  These distribution channels involved corrupt control wholesale prescription drug distribution companies ("Corrupt Distribution Companies"), which sold the second-hand drugs to pharmacies and other wholesale prescription distribution drug companies around the country.  The Corrupt Distribution Companies were designed to conceal the fact that the drugs being sold to the pharmacies were second-hand drugs.

3.   Pharmacies originally dispensed the drugs to Medicaid Beneficiaries in original, sealed, manufacturers' bottles.  Each bottle came from the manufacturer bearing a label (the "manufacturer's label") that indicated, among other things, the identity of the manufacturer; the brand of drug; the strength of drug; the required storage conditions (such as temperature); the lot number tracking the actual tablets, pills or capsules contained in the bottle back to the place, date and time of their manufacture; and the expiration date of the drugs.  Prior

to dispensing each bottle, pharmacies affixed to the bottle, on top of the manufacturer's label, a separate, adhesive label ("patient label") that included additional information, such as the name and address of the pharmacy, the name of the patient, information indicating that the drug was obtained through Medicaid, and dosage instructions. After purchasing the second-hand bottles originally dispensed to Medicaid Beneficiaries, Collectors and Aggregators used lighter fluid and other potentially hazardous chemicals to dissolve the adhesive on the patient labels, and remove the patient labels and all traces of the adhesive from the bottles. Through this process, the Collectors and Aggregators made the bottles appear new for the purpose of concealing the fact that they had already been dispensed, so that they eventually could be re-sold to unsuspecting consumers.

4. Because the prescription drugs involved in the scheme were not drugs of abuse, the bottles' high value depended on their appearing to contain new, unexpired drugs that legitimately had been obtained directly from manufacturers through authorized and licensed wholesale distributors.

5. The scheme itself was potentially dangerous to the unwitting consumers of second-hand prescription drugs. As described above, the bottles had been treated with potentially

hazardous chemicals, and the drugs themselves may have expired. Additionally, the participants in the scheme stored the drugs in uncontrolled conditions, such as car trunks, residences and rented storage facilities, which may not be sufficient to maintain the medical efficacy of such drugs over time.  For example, some HIV medications require constant storage in conditions between 25 and 30 degrees Celsius to maintain their efficacy.

6.   This scheme also involved material misrepresentations and omissions both on the front end, when Medicaid Beneficiaries initially obtained prescription drugs, and on the back end, when the second-hand drugs were dispensed to unwitting consumers filling their prescriptions.  On the front end of the scheme, the defendants relied on the fact that the Medicaid Beneficiaries filled their prescriptions for little or no cost for the purpose of selling the drugs into the underground market rather than ingesting them to treat their illnesses.  Each Medicaid Beneficiary's Medicaid card contains a disclaimer that "fraudulent use of this card is a punishable offense."  The Medicaid program, which would not have paid such benefits on behalf of the Medicaid Beneficiaries if the Medicaid Beneficiaries had disclosed that they were selling the drugs to others, unwittingly funded the scheme.  On the back end of the

scheme, the participants' purposeful obfuscation of the true source of the second-hand drugs defrauded legitimate consumers who unknowingly had their prescriptions filled with second-hand drugs that had been sold back to pharmacies as part of the scheme. Legitimate consumers would not knowingly fill their prescriptions with second-hand drugs, and legitimate consumers' insurance companies and other health care benefit programs would not knowingly reimburse pharmacies the cost of second-hand drugs. In this manner, the scheme was designed for Medicaid to be defrauded multiple times, as the same drugs that came from Medicaid Beneficiaries in the first place could be dispensed to Medicaid patients on the back end.

## THE DEFENDANT

7. STEPHEN M. COSTA, the defendant, is a wholesale distributor of prescription drugs operating in various states who purchased second-hand prescription drugs from aggregators in the New York City area to be redistributed into the stream of commerce.

## STATUTORY ALLEGATIONS

8. From in or about June 2013 through in or about December 2013, in the Southern District of New York and elsewhere, STEPHEN M. COSTA, the defendant, and others known and unknown, willfully and knowingly did combine, conspire,

confederate and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1347.

9. It was a part and an object of the conspiracy that STEPHEN M. COSTA, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

10. It was a further part and an object of the conspiracy that STEPHEN M. COSTA, the defendant, and others known and unknown, willfully and knowingly would and did execute and attempt to execute a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises money owned by and under the custody and control of a health care benefit program in connection with the delivery of and payment for

health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

The Grand Jury further charges:

11. The allegations contained in paragraphs 1 through 7 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

12. From at least in or about June 2013, up to and including in or about December 2013, in the Southern District of New York and elsewhere, STEPHEN M. COSTA, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Sections 331(a), 331(c), 331(k), 331(t), 333(a)(2), 333(b)(1)(D), and 353(e)(2)(A) and (B) of Title 21, United States Code.

13. It was a part and an object of the conspiracy that STEPHEN M. COSTA, the defendant, and others known and unknown, willfully and knowingly, and with the intent to defraud and mislead, would and did introduce and deliver for introduction into interstate commerce a drug that was misbranded, as that term is defined in Title 21, United States Code, Sections 352(a)

8

and (i), in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2).

14. It was further a part and an object of the conspiracy that STEPHEN M. COSTA, the defendant, and others known and unknown, willfully and knowingly, and with the intent to defraud and mislead, would and did receive in interstate commerce a drug that was misbranded, as that term is defined in Title 21, United States Code, Sections 352(a) and (i), and would and did deliver and proffer delivery thereof for pay and otherwise, in violation of Title 21, United States Code, Sections 331(c) and 333(a)(2).

15. It was further a part and an object of the conspiracy that STEPHEN M. COSTA, the defendant, and others known and unknown, willfully and knowingly, and with the intent to defraud and mislead, would and did alter, mutilate, destroy, obliterate and remove the whole and any part of the labeling of a drug, and would and did do other acts with respect to a drug while such drug was held for sale, after shipment in interstate commerce and which resulted in such drug being misbranded, as that term is defined in Title 21, United States Code, Sections 352(a) and (i), in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2).

16. It was further a part and an object of the conspiracy that STEPHEN M. COSTA, the defendant, and others known and

9

unknown, willfully and knowingly would and did engage in the wholesale distribution in interstate commerce of prescription drugs subject to Title 21, United States Code, Section 353(b) in a State, at a time when the defendant and his coconspirators were not licensed by that State, in accordance with the guidelines issued under Title 21, United States Code, Section 353(e)(2)(B), in violation of Title 21, United States Code, Sections 331(t), 333(b)(1)(D), and 353(e)(2)(A) and (B).

### Overt Acts

17.   In furtherance of the conspiracy and to effect the illegal objects thereof, STEPHEN M. COSTA, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a.   In or about June 2013, in the District of New Jersey, a co-conspirator not named herein delivered medication to be purchased by COSTA.

    b.   In or about November 2013, COSTA placed a telephone call from Florida to an individual in the Southern District of New York to discuss the future purchase of prescription drugs.

(Title 18, United States Code, Section 371.)

10

## FORFEITURE

18. As a result of committing the conspiracy to commit wire fraud and health care fraud offense alleged in Count One of this Indictment, STEPHEN M. COSTA, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense.

19. As a result of committing the conspiracy to commit wire fraud and health care fraud offense alleged in Count One of this Indictment, STEPHEN M. COSTA, the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, any property constituting, or derived from, proceeds traceable to such offense.

### Substitute Asset Provision

20. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982; Title 21, United States Code, Section 853.)

FOREPERSON

*Preet Bharara*
PREET BHARARA
UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

STEPHEN M. COSTA,

Defendant.

INDICTMENT

13 Cr. ___

(18 U.S.C. §§ 1956, 1349, and 371.)

/s/ Foreperson

PREET BHARARA
United States Attorney.

December 12, 2013
Filed sealed indictment.
U.S.M.J. Debra Freeman